AO 106 (Rev. 04/10) Application for a Search Warrant

**FILED**

## UNITED STATES DISTRICT COURT

UNITED STATES DISTRICT COURT
ALBUQUERQUE, NEW MEXICO

for the

District of New Mexico

JAN 10 2020

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) |
| | ) |
| 1. 1066 Don Felipe Rd., Belen, New Mexico, 87002; | ) |
| 2. silver 2009 Cadillac 4-door, NM license 946WLX; | ) |
| 3. Juan Antonio Martinez, aka: "Baby," born in 1974 | ) |

MITCHELL R. ELFERS
CLERK

Case No. 20 mr 46

### APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____ District of _____ New Mexico _____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 1962, 1959, 924(c), 922(g)(1) and 21 U.S.C. § 841(a)(1) | RICO, VICAR, possession of a firearm in furtherance of a drug trafficking crime, being a felon in possession of a firearm, and possession with intent to distribute methamphetamine. |

The application is based on these facts:

Refer to the attached affidavit by FBI SA Bryan Acee.

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Bryan Acee, FBI Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: January 10, 2020

_____
*Judge's signature*

City and state: Albuquerque, New Mexico

Karen B. Molzen, United States Magistrate Judge
*Printed name and title*

**ATTACHMENT A**
**The Person, Vehicle and Premises to be Searched**

1. **THE SUBJECT:** JUAN ANTONIO MARTINEZ II, aka: "BABY", year of birth 1974, last four of social security number 3060, further described as a Hispanic, male, adult, having brown hair, green eyes, being about 5-07 in height and approximately 145 pounds in weight. The search of MARTINEZ will consist of his body, above the waist and below the thighs, for tattoos evidencing membership in the SNM gang. Color photographs of MARTINEZ follow:

  

2. **THE SUBJECT VEHICLE:** silver 2009 Cadillac CTS, New Mexico license plate 946WLX, VIN: 1G6DF577290160834.

3. **THE SUBJECT PREMISES**: 1066 Don Felipe Road, Belen, New Mexico; further described as a single story mobile home with tan colored siding, white trim, and a red metal roof. There are red wooden steps leading up to the front door. The numbers 1066 are posted on the mailbox in front of the Subject Premises. Color photographs of the premises follow:

 



Attachment A

**ATTACHMENT B**
**Items to be Seized**

**Items to be Seized:** All evidence, fruits, and instrumentalities of violations of: 18 U.S.C. § 1962 Racketeer Influenced and Corrupt Organizations (RICO) Act; 18 U.S.C. § 1959 Violent Crimes in Aid of Racketeering (VICAR); 18 U.S.C. § 924(c) possession of a firearm in furtherance of a drug trafficking crime; 18 U.S.C. § 922(g)(1) being a felon in possession of a firearm or ammunition; and 21 U.S.C. § 841(a)(1) possession with intent to distribute methamphetamine; to include the following:

1. Evidence of membership or affiliation with the Syndicato de Nuevo Mexico (SNM) gang: to include any documents, photographs, drawings, writings, or objects depicting gang members names, initials, logos, monikers, slogans, or any item depicting potential gang membership, affiliation, activity or identity; "green light"/disciplinary list, murder/assault list, witness or confidential informant lists, inmate lists, address/telephone number list, letters, law enforcement reports, jail or department of corrections reports, judgments, pre-sentencing reports, newspaper articles, computer generated reports/printouts, legal documents, detention facility inmate number lists or addresses for inmates or detention facilities;

2. Controlled substances, including methamphetamine, drug paraphernalia, scales, and drug packaging materials;

3. United States currency;

4. Firearms and ammunition;

5. Records related to drug trafficking, such as: notes, ledgers, receipts, money orders, pre-paid money cards (MoneyPak, Green Dot, Wal-Mart, or other debit cards) and any documents relating to transporting, ordering, purchasing or distributing drugs;

6. Cellular telephones;

7. Articles of property tending to establish the identity of persons in control of premises, vehicles, storage areas, and containers being searched, including utility company receipts, rent receipts, addressed envelopes, and keys;

8. Safes, lock boxes, secure storage containers, or other types of locked containers, and hidden compartments that may contain any of the foregoing.

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

1.      I, Bryan Acee, Special Agent of the Federal Bureau of Investigation (FBI), being first duly sworn, make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the following premises, vehicle and person:

      a.   The Subject Premises: 1066 Don Felipe Road, Belen, New Mexico, 87002;

      b.   The Subject Vehicle: 2009 Cadillac CTS. Silver, New Mexico license 946WLX;

      c.   The Subject: JUAN ANTONIO MARTINEZ II, aka: "BABY" (born in 1974).

2.      A more detailed description and photographs of the Subject Premises, Subject Vehicle and Subject have been enumerated within "Attachment A," which has been attached hereto and incorporated herein by reference.

## PURPOSE OF THE AFFIDAVIT

3.      This affidavit is submitted in support of a warrant to search the residence, vehicle and person of Sindicato Nuevo Mexico (SNM) prison gang member JUAN ANTONIO MARTINEZ II, aka: "BABY," (MARTINEZ)[1] for evidence of violations of:

      a.   18 U.S.C. § 1962 Racketeer Influenced and Corrupt Organizations (RICO) Act;

      b.   18 U.S.C. § 1959 Violent Crimes in Aid of Racketeering (VICAR);

      c.   18 U.S.C. § 924(c) possession of a firearm in furtherance of a drug trafficking crime;

      d.   18 U.S.C. § 922(g)(1) being a felon in possession of a firearm or ammunition; and

      e.   21 U.S.C. § 841(a)(1) possession with intent to distribute methamphetamine (hereinafter referred to as the "Target Offenses").

4.      The specific items of evidence being sought are detailed within "Attachment B," which has been attached hereto and incorporated herein. I am submitting this affidavit based upon my experience and familiarity with the investigation of the SNM. This affidavit does not set forth all of my

---

[1] I suspect MARTINEZ has one or more gang tattoos on his body. I believe such tattoos may be evidence showing membership or affiliation with the SNM in violation of 18 U.S.C. §§ 1962(d) and 1959(a). More specifically, I believe such tattoos may constitute a conspiratorial overt act and have utilized such photographic evidence during SNM court proceedings in the past.

knowledge or summarize all of the fact-finding efforts in the overall investigation; rather, this affidavit sets forth facts in support of the requested warrant.

## AFFIANT'S RELEVANT TRAINING AND EXPERIENCE REGARDING GANGS AND DRUG TRAFFICKERS

5.      I am a Special Agent with the FBI and am recognized as a "federal law enforcement officer" within the meaning of Rule 41 of the Federal Rules of Criminal Procedure. I have been a sworn law enforcement officer for 20 years, serving as a police officer, detective, task force officer and Special Agent. I have been with the FBI since 2009 and am currently assigned to the Albuquerque Violent Crime Task Force (VCTF),[2] where I primarily investigate violent repeat offenders and federal drug and firearm related crimes. Prior to my assignment to the VCTF, I served on the FBI Safe Streets Gang Task Force (SSGTF) in Albuquerque, and the FBI-DEA Hybrid Cross Border Drug Violence Squad in Las Cruces, New Mexico. I was the lead case agent in the government's 2010-2014 Continuing Criminal Enterprise Drug Kingpin Act case against the Juarez Cartel, which resulted in extensive seizures of controlled substances, currency, firearms, and the indictment of multiple cartel leaders.

6.      In early 2015, I initiated a gang-racketeering investigation into the illegal activities of the SNM prison gang, which is also known as the "New Mexico Syndicate" or "Syndicato de Nuevo Mexico." I continue to serve as the lead case agent in the government's on-going racketeering case against the SNM, which has focused on the members, associates, and other support elements that facilitate criminal activities at the direction of the SNM.

7.      To date, approximately 150 SNM members and associates have been arrested as a result of this investigation. The majority of the defendants were charged federally and convicted. Over the course of the investigation, I have interviewed more than 125 gang members affiliated with the SNM (including current and former SNM leaders) regarding the various aspects of the organization.

8.      Over the past 20 years, I have primarily worked investigations pertaining to gangs and

---

[2] The VCTF is an FBI-sponsored task force comprised of investigators from the FBI, New Mexico State Police, New Mexico Corrections Department, Albuquerque Police Department and Bernalillo County Sheriff's Office.

drug trafficking organizations (DTOs). I have interviewed hundreds of gang members and drug traffickers about the various aspects of their criminal activities.

9.      I have developed and managed numerous informants who have been members of gangs or DTOs and monitored dozens of wiretaps and electronic surveillance recordings targeting gang members or drug distributors. I have also worked in an undercover capacity to infiltrate such criminal organizations. I have received hundreds of hours of formal training in the area of gang, drug, and organized crime investigations from federal, state, and local law enforcement agencies. I've participated in hundreds of investigations pertaining to drug distribution, money laundering, firearms trafficking, gangs and criminal enterprises.

10.     I have qualified, in federal and state courts, as an expert witness on drug trafficking and possession of drugs with intent to distribute. I have qualified in federal court as an expert witness on the Juarez Cartel and I am an FBI subject matter expert (SME) on the Juarez Cartel and SNM prison gang.

11.     I have served as an adjunct professor; law enforcement instructor; and presenter on drug and gang investigations at the California Highway Patrol, Los Angeles Police Department, New Mexico State Police and Bernalillo County Sheriff's Office Academies; as well as at training classes and seminars for the United States Department of Justice Organized Crime Drug Enforcement Task Force, International Outlaw Motorcycle Gang Investigator's Association, California Narcotic Officer's Association, California Gang Investigator's Association, New Mexico Gang Task Force, New Mexico State University, and University of New Mexico.

12.     Based upon my training and experience, I am aware of the following information as it pertains to gang/criminal enterprises and DTOs.

13.     Individuals engaged in the type of criminal conduct constituting the Target Offenses maintain documents, letters and records relating to their illegal activities for long periods of time.  This documentary evidence is usually secreted in their place of residence, or the residences of family members, friends or associates, in their business locations, or in stash houses.  This documentary evidence includes, but is not limited to: telephone numbers, telephone books, address books, credit and hotel receipts, travel

receipts, records in fictitious or coded names, false identification, money order receipts, money orders, money remittance receipts, pre-paid money cards such as, MoneyPak, Wal-Mart, Green Dot, or other debit cards, bulk United States currency, money collection logs, such as "tally" sheets, drug load sheets, shipping/mailing receipts, detention facility inmate number lists or addresses for inmates or detention facilities.

14.     Individuals engaged in the type of criminal conduct constituting the Target Offenses described herein maintain regular contact with one another.  This contact does not terminate once an individual is incarcerated. Members of gang/criminal enterprises routinely send and receive letters from other members of the organization in which they discuss ongoing criminal activities and request various forms of assistance, to include financial help and/or witness intimidation or elimination (as has been the case in the SNM investigation).  In addition, SNM members often keep photographs of themselves and other members of the gang/criminal enterprise in order to impress or intimidate others.

15.     Members of the SNM, and the street gangs that support the SNM, aggressively pursue informants, suspected informants, and persons who betray the SNM. I am aware that SNM members and associates relay such information to one another through covert communications, messages, telephone calls, personal visits, letters, and mail disguised as "legal mail."  SNM members and associates send controlled substances to inmates disguised as legal mail. The instruments used to create fictitious and fraudulent legal mail include letters, writings, envelopes, stamps, labels, printing devices, or markings used to create such packages.

16.     I know that members and associates of gang/criminal enterprises and DTOs have access to numerous cellular phones, often at the same time, in an effort to avoid law enforcement monitoring.  I have observed gang members, who are involved in drug trafficking, routinely use pre-paid phones requiring no subscriber information or use fictitious names to register the cellular phones used to advance their unlawful activities.  These cellular telephones often contain names and phone numbers of other co-conspirators; text messages utilized to further their illicit activities, photographs and videos of gang members, drugs, drug proceeds, or firearms.

17.     In addition, I am also familiar with the increasingly popular use of text messaging, instant messaging, and electronic mail, used by gang/criminal enterprises and DTOs to advance their unlawful activities. Members of gang/criminal enterprises and DTOs often use the same strategy to mask their ownership of vehicles, real property, and utility services, in an effort to avoid detection by law enforcement.

18.     Individuals involved in the distribution of controlled substances often conceal evidence of their drug trafficking activities in their residences and businesses, or the residences of friends or relatives, and in surrounding areas to which they have ready access, such as garages, carports and outbuildings. They also conceal evidence in vehicles, including vehicles outside of their residences, so that they have ready access to it and so that they can hide it from law enforcement, including law enforcement officers executing search warrants at their residences or businesses. I have also observed individuals involved in drug trafficking bury evidence underground in various containers on their property.

19.     Members of gang/criminal enterprises and DTOs often maintain records of their transactions in a manner similar to the record keeping procedures of legitimate businesses. Even after the drugs are sold, documentary records often remain for long periods of time, even years, to memorialize past transactions, especially when debts remain open, the status of accounts receivable and accounts payable, and the names and phone numbers of suppliers, customers, and co-conspirators, and other associates who may assist drug traffickers in other ways, such as helping with the cleansing of otherwise "dirty" money, through a variety of means, including investments into legitimate enterprises and structuring deposits of large amounts of U.S. Currency into financial institutions in such a way so as to avoid the detection of law enforcement, and any reporting requirements of banking institutions. These records can be maintained on paper, in the form of business and personal ledgers and diaries, calendars, memoranda, pay-owe sheets, drug ledgers, IOUs, miscellaneous notes, money orders, customer lists, and phone address books. I have personally been involved in search warrants which resulted in the discovery of such records, which were more than one year old.

20.     Individuals involved in gang/criminal enterprises and DTOs possess items of identification, including but not limited to, driver's licenses, rent receipts, bills, and address books. These items are relevant to the identity of those involved in the criminal enterprise, the possessor of the items seized, and occupants of the premises searched.

21.     I am aware that members of the SNM use, possess, and conceal bladed and/or blunt weapons, such as knives, shanks, razor blades, metal pipes, metal fittings, edged weapons, and firearms, to include rifles, shotguns, and handguns.  These weapons are used and possessed by members of the gang to commit murders, attempted murders, assaults, robberies, to protect illicit drug supplies, to avoid arrest or escape from custody, to intimidate rivals, victims, witnesses, and persons who have betrayed the SNM, to impose discipline within the gang, and for other criminal activity. I know that firearms are instrumentalities of the crime of drug trafficking and that firearms are critical "tools of the trade" for the SNM.  Members and associates of the SNM are expected to possess and maintain weapons and firearms.

22.     These items are often stored by members of gang/criminal enterprises and DTOs on their person, in their businesses, residences and surrounding garages, outbuildings, and yards, the residences of friends or relatives, and vehicles.

## OVERVIEW OF THE INVESTIGATION

23.     For the past five years, the FBI and New Mexico Corrections Department (NMCD) have been engaged in the investigation of the ultra-violent SNM prison gang. The SNM is New Mexico's largest gang and it has historically controlled the majority of New Mexico's prisons and Hispanic street gangs. Over the past thirty years, SNM members have murdered four New Mexico police officers.[3]

24.     By way of background, the SNM had been on-and-off federal and state law enforcement's radar for many years; however, no prior investigations resulted in substantial prosecutions of SNM members. The 2015 investigation began after leaders of the gang directed SNM members on the street to locate and murder the then cabinet secretary of the NMCD. The SNM leaders also called for the

---

[3] Mesilla Marshal's Office Sergeant Thomas Richmond (1988), Albuquerque Police Sergeant Cheryl Tiller (1998), Bernalillo County Deputy James McGrane (2006) and Rio Rancho Police Officer Nigel Benner (2015).

murder of two additional NMCD administrators and their families. The investigation was further predicated by the fact the SNM had a decade's long history of murder, kidnapping, extortion, drug trafficking, aggravated assault and other violent crimes. The investigation was subsequently designated a United States Department of Justice Organized Crime Drug Enforcement Task Force (OCDETF) investigation, titled "Operation Atonement."

25.     While the investigation remains active, I am able to report the FBI significantly disrupted the SNM through persistent and advanced investigative techniques, to include:

a.   98 undercover drug and firearm buys from SNM members/associates;

b.   46 confidential informants developed within the gang and utilized operationally;

c.   9 court-authorized wire intercepts with 11 extension orders;

d.   11 pen register/trap and trace orders to locate an SNM murder fugitive in Mexico;

e.   More than 500 hours of electronic surveillance recordings of gang meetings;

f.   10 "cold-case" homicides solved and charged as RICO Act or Violent Crimes in Aid of Racketeering (VICAR) violations;

g.   RICO Act conspiracy charges comprised of more than 300 overt acts committed by members of the SNM.

26.     The five year investigation was segmented into four stages, to include: four separate large-scale takedown operations (Phases 1-4); extensive trial preparation and motions hearings; three separate racketeering trials in Las Cruces and Albuquerque, New Mexico; tracking and arresting fugitive SNM member ANGEL DELEON in Mexico; post-trial hearings; sentencings, which remains on-going; and the continued pro-active monitoring of the gang by law enforcement and corrections officials.

## THE SNM CRIMINAL ENTERPRISE

27.     The SNM, including its leadership, membership, prospects, and associates, constitutes an enterprise as defined in 18 U.S.C. §§ 1959(b)(2) and 1961(4), that is, a group of individuals associated in fact that engaged in, and the activities of which, affect interstate commerce. The enterprise constitutes an ongoing organization whose members and associates functioned as a continuing unit for a common

purpose of achieving the objectives of the enterprise.

28.     I am aware that members and associates of the SNM commit, conspire, attempt, and threaten to commit acts of violence to protect and expand the enterprise's criminal operations and reputation.   Historically, the SNM generated income by distributing controlled substances, extorting weaker drug dealers, and participating in robberies and burglaries. To maintain the SNM criminal enterprise, members of the gang discuss: the membership, rules (which the SNM refer to as "reglas"), and enforcement of the rules; the status of SNM members and associates; the discipline of SNM members; encounters with law enforcement; the identities of individuals suspected of cooperating with law enforcement and the proposed actions to be taken against them; and plans and agreements regarding the commission of future crimes, including murder, assault, robbery, drug distribution, possession of weapons and firearms, as well as ways to conceal these crimes.

29.     With regard to the possession and concealment of weapons and firearms, I am aware members of the SNM, and the street gangs that support the SNM, use, possess, and conceal bladed and/or blunt weapons, such as knives, shanks, razor blades, metal pipes, metal fittings, and similar weapons when incarcerated. Similarly, SNM members on the street use, possess, and conceal firearms and edged weapons.   These weapons are used and possessed by members of the gang to commit murders, attempted murders, assaults, robberies, to protect illicit drug supplies, to avoid arrest or escape from custody, to intimidate rivals, victims, witnesses, and members or associates who have betrayed the SNM, to impose discipline within the gang, and for other criminal activity. I have arrested dozens of SNM members and associates for violations of federal law, to include: racketeering, murder, assault, robbery, firearms violations, drug trafficking, introducing contraband to a jail facility, witness intimidation/retaliation, and the conspiracies associated with those offenses.

30.     I am aware the SNM maintains separate, but related, hierarchies within the NMCD (state) prisons and the BOP (federal) facilities. The majority of the SNM membership is confined to the NMCD prisons; however, dozens of members are serving time in the BOP or are on federal supervised release. With the federal convictions of scores of SNM members, their presence within the BOP will increase.

31.     An SNM member can be considered a "state" or a "fed" member, and those terms are used to describe where the individual member "earned his bones" or was "made" a member – that is, performed criminal acts that displayed fidelity to the mission and interests of the gang. The terms may also describe where the member served the majority of his time as a member of the gang. I have observed some members to be proud of the fact they represented the gang in both structures.

32.     I am aware that the federal SNM members have peace treaties with some of the prison gangs within the BOP.  As such, the federal members of the SNM will need to educate their incoming "brothers" on the proper ways and mechanisms within the BOP.  One potentially disastrous scenario for the SNM would be for the gang to have informants or cooperators among the ranks of the incoming members.  In order to maintain power within the federal prisons, I believe the SNM will need to remain organized, dedicated to their mission, and rid themselves of informants and weak members.

33.     The SNM has long sought to bring all of the New Mexico-based, Hispanic street gangs under their control, much like the Mexican Mafia prison gang has done with the California Sureños street gangs.[4] I believe the SNM's unification of the street gangs is needed to enhance the SNM's presence inside the prisons and counter the growth of rival prison gangs.

34.     In summary, I believe the SNM exists almost exclusively to engage in racketeering activity.  I believe the SNM has historically engaged in a wide variety of crimes; however, I consider the SNM to be most proficient at murder and smuggling drugs into prison.

**THE HISTORY OF THE SNM**

35.     The SNM was formed at the Penitentiary of New Mexico after a prison riot in February 1980. During the prison riot, fourteen correctional officers were taken hostage and several of them were seriously assaulted and raped by inmates. Thirty-three inmates were killed during the riot, and more than

---

[4] Sureños (Spanish: Southerners) Sur 13 or Sureños X3 are groups of affiliated Hispanic gangs that pay tribute to the Mexican Mafia while in state and federal correctional facilities. The Sureños' originated in southern California and that region remains its stronghold, although gang officers in Arizona, New Mexico, and Nevada report a large presence of Sureños gangs in their regions. Sureños have emerged as a national gang in the United States. Source: FBI National Gang Intelligence Center and BOP.

two hundred were injured. The majority of inmates killed were perceived to be "rats" or informants.

36.     Following the prison riot, the SNM expanded throughout the New Mexico penal system and has bolstered more than 500 members since the early 1980s. NMCD officials estimated the SNM is currently comprised of at least 250 active members, who were known as "hermanos," "brothers," "carnales," "dons," "jefes," "big homies," or "Zia manos."

37.     Despite being imprisoned and closely scrutinized by prison officials and the FBI, SNM leaders still manage to convey their orders to gang members and associates throughout the prison system and outside the prison system through a variety of means, including contraband cellular telephones, secret notes called "kites" or "welas," coded letters, and messages conveyed by complicit visitors.[5] When SNM members or associates complete their sentences and rejoin their communities, they are expected to remain loyal to the SNM and work to further the goals of the SNM outside the prison environment.  One of the significant goals of the SNM is to control and profit from drug trafficking inside the penal system and on the street.

38.     In addition to exerting its control in the NMCD and BOP, the SNM also operates on the streets of New Mexico by intimidating and influencing smaller New Mexico Hispanic gangs for the purpose of establishing a larger network for the SNM's illegal activities.  If a gang does not accede to the SNM, the SNM will assault or kill the gang's members who are not in custody as well as those members who are incarcerated within the NMCD or county jails. In addition to intimidation through direct assaults, the SNM is also able to assert control and influence over gang members outside the prison walls because gangs do not want their members outside the penal system to be assaulted or killed, and because the gang members know that, if they are incarcerated, they may encounter SNM members while they serve their sentences.

39.     In years past, the SNM engaged in a violent war with rival prison gangs, to include the Aryan Brotherhood, Barrio Azteca, Burqueños, and Los Carnales. I believe the SNM currently maintains

---

[5] The SNM utilizes female family members and girlfriends/wives to pass messages to other members of the gang.  Female associates and family members have also been used to smuggle drugs into prison facilities on behalf of the SNM.

peace treaties with the Aryan Brotherhood and Los Carnales; however, the SNM remains in conflict with the Burqueños and all Texas-based prison gangs, to include the Barrio Azteca and Texas Syndicate. Within the prison system, this rivalry manifests itself in beatings and stabbings, which often result in death. Outside the prison system, the SNM fights for control of territory in which to conduct narcotics trafficking and other crimes, as well as to recruit and influence non-gang members. In addition to fighting for control over numerous illegal activities and using violence and terror for the purpose of enriching members, the SNM also engages in violence simply to assert its gang identity, to claim or protect territory, to challenge or respond to a challenge, to retaliate against a rival gang or member, to gain notoriety, and show superiority over others. I have heard from numerous SNM members they believe the gang's greatest legacy is its reputation as an ultra-violent organization.

40.     The SNM strives to have a reputation for being strong and powerful and must maintain its membership to continue functioning as an organization in prison and on the streets. If the SNM is perceived as being weak, then rival gangs could challenge and assault its members and take over its territory. This could cause the SNM to lose membership and eventually dissolve. If the SNM maintains a large membership and a reputation for being dominant, rival gangs may think twice before they challenge it. Similarly, victims and witnesses may think twice about assisting authorities with any prosecution attempt against the gang. I have encountered potential witnesses and victims who were too afraid to speak with law enforcement and much less willing to testify against the SNM.

41.     A member of the SNM is expected to seek out and beat, stab, or shoot rival gang members. Similarly, a member of the SNM is expected to confront and attack suspected law enforcement informants and sex offenders. Such opportunities are referred to as "smash on sight."

42.     SNM members identify themselves with the Zia symbol and the letters "SNM" or "S." The SNM members also utilize the numbers "19," which represents the 19th letter of the alphabet, "S," and "505," which corresponds with the area code for the greater Albuquerque area. The SNM claims the entire state of New Mexico as its territory, which is broken up by four geographical regions: North, South, East and West.  SNM members display these numbers, letters, and symbols in

tattoos, graffiti, drawings, and on clothing as a way of displaying their affiliation, loyalty, and commitment to the SNM.

43.     Only men can be members of the SNM.[6] The term "Zia Lady" is used by the SNM to describe highly respected and influential female associates of the gang.

44.     SNM members frequently commit "branded" criminal acts, in other words, they commit crimes in the name of the gang. Examples of branded criminal acts include: gang members shouting references to SNM before or during a crime; gang members demanding property or services because of their membership; and killing or attempting to kill members of rival gangs. SNM members have been known to kill or attempt to kill law enforcement officers as well (see footnote 2 for additional details). Weapons, to include blunt force and edged weapons, and firearms, to include handguns, rifles, and shotguns, are important tools of the trade and instrumentalities of the SNM.

45.     SNM members operate under a "blood in, blood out" philosophy, which prohibits them from dropping out of the gang. The term "blood in, blood out," means a prospective member must assault or kill a person to gain entrance into the gang, and the only way out is death. A prospective member of the SNM must be sponsored by at least three SNM members, who "raise their hand," or vote-in the prospect.

46.     Members who are in "bad standing" within the gang are put on a "greenlight" list, which means they are to be assaulted or killed by other members of the gang. If a member is to be killed by the gang, the responsibility often falls on the senior member(s) that sponsored, or brought, that member into the gang. Similarly, if a leader is put on the greenlight list, then the younger members who were brought in by that leader may be asked to take out the leader.

47.     SNM members are forbidden to speak with law enforcement officials and to do so may result in the SNM member's violent death at the hands of his fellow gang members, as was the case on multiple occasions in this investigation.

---

[6] The NMCD has identified some female inmates as suspected members of the SNM; however, I do not believe a female can be a "suspected" or "validated" (the two classifications NMCD designates gang members) SNM member. My belief is based on my interviews of dozens of validated SNM members, to include leaders and founding members of the gang.

## VIOLENCE TARGETING GOVERNMENT WITNESSES AND AGENTS

48.     Over the course of this investigation, I have become aware of several instances in which members or associates of the SNM have threatened or conducted violent acts aimed at victims, witnesses, case agents, federal prosecutors, and informants (to include suspected informants).

49.     The FBI refers to its informants as confidential human sources (hereinafter "CHS" for both plural and singular). Some of the examples of violence targeting victims, witnesses, agents, attorneys and CHS follow:

50.     Example 1:  In February 2016, during a recorded telephone call, a CHS, who was a member of the SNM, spoke with SNM member CARLOS HERRERA, aka: "LAZY," and HERRERA's mother, who was a long-time heroin dealer and prior target of the investigation. The CHS attempted to order heroin from CARLOS HERRERA's mother. CARLOS HERRERA and his mother became suspicious of the CHS and subsequently declined to sell heroin to the CHS. A few days later, the CHS was shot several times by a street gang member with family ties to the SNM.  It should be noted the CHS was utilized in the Operation Atonement Phase I takedown, which resulted in the arrest of dozens of SNM members and associates.

51.     Example 2:  In February 2016, SHAUNA GUTIERREZ, the girlfriend of SNM member JOE LAWRENCE GALLEGOS, had SNM member PAUL RIVERA, aka: "OSO," and SNM associates BRANDY RODRIGUEZ, aka: "WEDA," and SANTOS GONZALEZ assault victim J.G. At the time of the assault, J.G had agreed to cooperate with law enforcement in an aggravated battery prosecution against JOE LAWRENCE GALLEGOS. The assailants beat J.G. with clubs and a machete, and told J.G. the assault was due to the fact J.G. was scheduled to testify against JOE LAWRENCE GALLEGOS. During the attack, J.G. was struck in the head with the machete at least two times and suffered serious bodily injuries.

52.     Example 3:  In March 2016, SNM member CARLOS HERRERA, aka: "LAZY," was overheard on a covert FBI recording device talking to other SNM members about killing FBI agents and blowing up the FBI building, due to the FBI's investigation of the SNM.

53.     Example 4: In March 2016, SNM member CARLOS HERRERA, aka: "LAZY," was overheard on a covert FBI recording device talking to other SNM members about killing informants and anyone else that cooperated with the FBI.

54.     Example 5: In March 2016, the brother of a CHS was shot by suspected members of the SNM in Doña Ana, New Mexico, and the family of the CHS reported they were threatened by members of the SNM.

55.     Example 6: In April 2016, SNM member ARTURO GARCIA, aka: "SHOTGUN," who had been charged with murder in aid of racketeering and RICO conspiracy, communicated to a cooperating witness, the names of persons who were on the SNM's "green light" list. The list included several employees of the NMCD, various jail staff members, and several cooperating defendants.

56.     Example 7: In June 2016, SNM member SAMUEL SILVA, aka: "RABBS", who was facing federal carjacking and firearms charges, solicited a CHS to locate and murder two civilian victims before his federal trial began. SAMUEL SILVA provided the CHS with the names, addresses, and photos of the victims. Prior to requesting the CHS's assistance, SAMUEL SILVA requested another SNM member to murder his victims; however, that member was arrested on RICO conspiracy charges during the Phase II takedown operation.

57.     Example 8: In July 2016, a cooperating defendant, who was a member of the SNM incarcerated with other SNM members, reported several members were trying to get close to former SNM leader, who had pled guilty to VICAR charges, so they could murder him.

58.     Example 9: In August 2016, SNM leaders called for a meeting among SNM members (state and federal) on the street, to re-organize the gang and "hit" certain informants and witnesses that were suspected of cooperating with the FBI. The threat was mitigated when the FBI executed twelve federal search warrants on suspected conspirators and recovered twelve firearms during the Phase III takedown operation.

59.     Example 10: In August 2016, correctional officers at the Torrance County Detention Center in Estancia, New Mexico, found three shanks in the SNM pod where several SNM racketeering

defendants were being held. Subsequent cooperating defendants, who were in the pod at the time, reported the shanks were to be utilized to hit fellow SNM members who were suspected of cooperating with the FBI.

60.     Example 11: In December 2016, an SNM member who had been charged with murder in aid of racketeering, decided to cooperate and debriefed with the government. The cooperating defendant had been housed with the other SNM defendants in the pending RICO cases and related the SNM wanted to hit, "Acee (Special Agent Bryan Acee) or Armijo (Assistant U.S. Attorney Maria Armijo) because they're the lead agent and prosecutor." The cooperating defendant went on to say, "but anyone on the team would work" and explained the SNM wanted to hit the government to "get revenge and to demonstrate the power of the SNM."

61.     Example 12: In January 2017, an SNM member who was incarcerated in the NMCD for first degree murder was debriefed by the government. The SNM member was the highest-ranking member of the SNM at the Southern New Mexico Correctional Facility in Las Cruces, New Mexico, at the time. During the interview, the SNM member said the SNM wanted to hit an FBI agent, prosecutor or judge if the opportunity presented itself, due to the RICO prosecution of the gang.

62.     Example 13: In October 2017, an SNM member who had been charged with murder in aid of racketeering, agreed to cooperate with the government. The cooperating defendant, who was in the USMS cell block at the federal courthouse, surrendered two shanks to case agents. The cooperating defendant had carried both shanks in his rectum on each prior trip to court and had sat in the courtroom with them. The cooperating defendant said he had intended to hit a cooperator(s), if given the chance. I am aware at least four other SNM defendants possessed shanks while in the courtroom, because officials subsequently recovered the weapons or those defendants ended up cooperating and admitting such.

63.     Example 14: In July 2018, a government witness who was incarcerated at the PNM North facility received a threatening communication. The witness previously testified as a witness in all three racketeering trials against the SNM. The government witness received a sack lunch with his name and prison cell written on the bag. Inside the bag, the witness discovered a "kite" (a small clandestine note or

letter passed from inmate-to-inmate) located between two pieces of sliced cheese. The kite indicated the witness was a rat and a liar, and threatened the witness and his family. The kite referenced a violent kidnapping and murder that had occurred in Albuquerque, and the author of the kite claimed to have photos of the witness's ex-wife. The author of the kite referenced taking the witness's ex-wife and making her their wife, and included a pornographic image to accompany the threat.

64.     Example 15: In August 2018, an SNM member who had been charged with VICAR murder, agreed to cooperate and submitted to a debrief. Prior to this, the SNM member had been incarcerated with the other SNM RICO defendants. The SNM member related to the government that SNM leader ARTURO GARCIA, aka: "SHOTGUN," "wants to kill Acee (Special Agent Bryan Acee) or anyone on the prosecution team to make sure he remained good when he entered the feds (BOP)." ARTURO GARCIA boasted to the other inmates he had money and resources to "get things done."

65.     Example 16: On or about January 11, 2019, SNM member DOMINIC SEDILLO, aka: "SICARIO," and an SNM associate shot a former member of the SNM, who had dropped-out of the gang. The shooting took place outside a residence in Albuquerque, New Mexico, and the victim survived, but did not cooperate with police. DOMINIC SEDILLO and the other suspect are currently facing aggravated battery charges as a result of that incident.

66.     Example 17: On February 12, 2019, SNM member CHRISTOPHER CHAVEZ, aka: "CRITTER," was assaulted by SNM members DANIEL SANCHEZ, aka: "DAN DAN," ARTURO GARCIA, aka: "SHOTGUN," and CARLOS HERRERA, aka: "LAZY," at the Otero County Detention Center in Chaparral, New Mexico. I believe the assault was the result of CHRISTOPHER CHAVEZ having submitted a letter to U.S. District Court Judge James O. Browning stating he wanted to renounce the SNM and would sit down and debrief with the FBI. The letter was uploaded by the court into the online court file and visible to all of the other SNM racketeering defendants, via their attorneys.

67.     Example 18: On July 22, 2019, at about 11:30 p.m., former SNM leader LEROY LUCERO, aka: "SMURF," was shot and killed in the driveway of his residence in Las Vegas, New Mexico. LEROY LUCERO had testified in pretrial motions hearings and as a government witness during

one of the government's lengthy RICO trials. I was present, as the case agent, during the trial and believe LEROY LUCERO's testimony was a significant factor in the conviction of several SNM members.

68.     Example 19: In August 2019, SNM member MARVIN MCALLISTER, aka: "LOONEY," threatened a former SNM member, who testified for the government, and told the former member he (MARVIN MCALLISTER) obtained information "on all the cooperators" from SNM member ARTURO GARCIA, aka: "SHOTGUN." MARVIN MCALLISTER said, "you guys will have a welcoming party when you get there (BOP). Trust me, you guys got it coming." MARVIN MCALLISTER said he had reviewed ARTURO GARCIA's tablet device, which contained all of the discovery material in the RICO cases. MARVIN MCALLISTER told the witness the SNM had written the names of all the cooperators and sent the lists to SNM members in the state and federal prisons. MARVIN MCALLISTER also said the SNM had copies of newspaper clippings, which publically identified cooperators utilized during the various RICO prosecutions.

69.     Example 20: In October 2018, JODY RUFINO MARTINEZ, aka: "MONO," shot rival, D.S. in Cuarteles, New Mexico. Between October 2018 and January 2019, JODY RUFINO MARTINEZ attempted to intimidate witness, L.L. by trying to persuade the witness to not cooperate with law enforcement regarding the shooting of D.S.

70.     Example 21: In January 2019, JODY RUFINO MARTINEZ, aka: "MONO," and his girlfriend, S.B., retaliated against D.S. for cooperating with law enforcement after the shooting. S.B. provided paperwork to an inmate in the Rio Arriba County Detention Facility following D.S.'s cooperation, and D.S. was subsequently assaulted by inmates at the facility.

71.     Example 22: In September 2019, a defendant on an unrelated drug trafficking case debriefed with FBI personnel and reported JODY RUFINO MARTINEZ, aka: "MONO," gave orders to others to have witness L.L. handled for cooperating with law enforcement in the shooting of D.S.

72.     Example 23: In October 2019, a CHS reported JODY RUFINO MARTINEZ, aka: "MONO," placed a green light on D.S. and intended to have D.S. murdered.

73.     Example 24: In December 2019, JODY RUFINO MARTINEZ, aka: "MONO," accused

SNM member JOSE LOVATO, aka: "JOSER," of cooperating with law enforcement and threatened JOSE LOVATO in front of correctional center staff.

74.     <u>Example 25</u>: In December 2019, a CHS reported JODY RUFINO MARTINEZ, aka: "MONO;" and JONATHAN GOMEZ, aka: "BABY G;" were in possession of an SNM hit list targeting current and former NMCD officials, and FBI Special Agent Nancy Stemo.

75.     <u>Example 26</u>: In December 2019, a CHS reported JODY RUFINO MARTINEZ, aka: "MONO," had placed a greenlights on Special Agent Stemo for charging him with firearm and RICO Act violations, and on JOSE LOVATO, aka: "JOSER," and ROBERT TRUJILLO, aka" "SLEEPY;" for being suspected cooperators.

76.     To date, FBI agents have seized more than 85 firearms from SNM members during Operation Atonement. Some of the firearms seized were purchased from SNM members during undercover buys. During one such incident, SNM member MATTHEW MARTINEZ, aka: "GOAT," sold an FBI informant four unused ballistic vests. MATTHEW MARTINEZ was in possession of two firearms when FBI agents executed a search warrant on his residence.

## THE CONFIDENTIAL SOURCES

77.     During the course of this investigation, I utilized two Confidential Human Sources (CHS) to collect information on MARTINEZ. Both CHS are members or associates of the SNM. Background information on CHS-1 and CHS-2, to include reliability, motivation, and criminal history, follows.

78.     **Confidential Human Source 1:** CHS-1 has known MARTINEZ for more than ten years. CHS-1 is a documented member of the SNM, primarily aligned with the federal SNM structure, and began cooperating with the government in 2016. During CHS-1's period of cooperation, CHS-1 participated in several consensually recorded conversations with SNM members. CHS-1 also utilized a cellular telephone, equipped with court authorized wire interception equipment, to converse with other SNM members. CHS-1 provided background information about the membership, structure, and customs of the SNM. CHS-1 identified individuals believed to be SNM members and/or associates. CHS-1 positively identified many subjects of the investigation from photographs and participated in controlled

drug buys. CHS-1 has two felony convictions for aggravated assault. CHS-1 is cooperating with the government in an effort to reduce crime in the community. CHS-1 has not been paid for their cooperating; however, CHS-1 previously received a positive recommendation from the government during a probation violation before the court. CHS-1 is no longer on probation. I consider the information CHS-1 provided to be reliable because much of it was corroborated through independent source information, information obtained from public databases, law enforcement investigations, controlled buys, and physical and electronic surveillance. To my knowledge, CHS-1's information has not been found to be misleading.

79.    **Confidential Human Source 2:** CHS-2 is an FBI informant and has known MARTINEZ for more than ten years. CHS-2 provided background and current information on MARTINEZ and his criminal associates. I recruited CHS-2 as a source of information in early 2015 because CHS-2 was closely affiliated with several SNM members who were engaged in criminal activities. CHS-2 aided me in the collection of evidence against members of the SNM and other criminal enterprises. Information provided by CHS-2 led to the issuance of at least ten (10) federal search warrants, the arrest of multiple criminal suspects, and the recovery of methamphetamine, heroin, fentanyl, firearms, ammunition, and U.S. currency. CHS-2 recently provided me with information that resulted in the arrest of a violent armed robber who was responsible for more than a dozen commercial armed robberies around New Mexico. CHS-2 is motivated to assist the FBI to help reduce violent crime and drugs in the community. CHS-2 has prior felony convictions for receiving or transferring a stolen vehicle, burglary, and distribution of heroin. CHS-2 does not have any pending charges. CHS-2 has received approximately $9,000 in financial assistance from the FBI. I consider the information CHS-2 provided to be reliable because much of it was corroborated through law enforcement investigation, controlled buys, and physical and electronic surveillance. To my knowledge, CHS-2's information has not been found to be false or misleading.

## FACTS AND CIRCUMSTANCES ESTABLISHING PROBABLE CAUSE

80.    In continuance of the FBI's investigation of the SNM, numerous CHS, cooperating defendants, witnesses and citizen informants regularly report on the criminal activities of SNM members and associates. In accordance with such reporting, I have learned MARTINEZ is selling

methamphetamine and in possession of a firearm. Moreover, MARTINEZ is a suspect in several recent shootings in Albuquerque, some of which I have detailed herein.

81.     **Background Information provided by CHS-1 concerning MARTINEZ:** CHS-1 knows MARTINEZ to be a member of the federal SNM and currently selling methamphetamine to other members of the SNM, as well as the Valley Gardens and Barelas street gangs. CHS-1 purchased methamphetamine from MARTINEZ in the past; however, CHS-1 is no longer using or selling drugs. CHS-1 related CHS-1 was aware of MARTINEZ' drug distribution activities because CHS-1 previously sold methamphetamine and Suboxone for MARTINEZ. CHS-1 knew MARTINEZ to regularly carry a pistol for protection and had seen him with a pistol on several occasions over the past few weeks. CHS-1 and MARTINEZ regular communicated with one another.

82.     **Background Information provided by CHS-2 concerning MARTINEZ:** CHS-2 knows MARTINEZ well, as both are rooted in the federal SNM structure, and both previously sold heroin for another federal SNM member in Albuquerque. CHS-2 and MARTINEZ were cohorts in the same SNM heroin distribution ring for a couple of years. CHS-2 still maintains regular contact with MARTINEZ and has been inside the Subject Premises in recent weeks. CHS-2 has observed multi-ounce quantities of methamphetamine and firearms inside the residence on numerous occasions. CHS-2 said MARTINEZ lives with a female relative, not his wife, and drives the Subject Vehicle. CHS-2 described MARTINEZ as being very cautious and paranoid about the FBI watching him. CHS-2 related MARTINEZ closely monitored the government's case against the SNM and had stopped selling methamphetamine for a period of time after some of the large-scale SNM takedowns (December, 2015; April, 2016; September, 2016; and September 2019). MARTINEZ frequently complained to CHS-2 about the number of state SNM members who cooperated with the FBI. CHS-2 and MARTINEZ regular communicated with one another.

83.     **Recent Shooting Incidents involving the Target Subject:** The following incidents were reported to the Albuquerque Police Department in January 2010:

84.     **Incident 1:** On or about January 5, 2020, MARTINEZ went to a residence in

Albuquerque and attempted to contact persons inside the home regarding an on-going dispute. The people inside the residence, WITNESS-1 and WITNESS-2, knew MARTINEZ to have violent tendencies and talked to him through the closed door. WITNESS-1 and WITNESS-2 feared MARTINEZ and did not want to open the door. Instead, WITNESS-1 and WITNESS-2 requested the police respond to the location and informed MARTINEZ the police had been called. WITNESS-2 observed MARTINEZ return to his vehicle (the Subject Vehicle) retrieve a pistol from under the front hood, and fire it into the air two times.

85.    **Incident 2:** On or about January 5, 2020, MARTINEZ and WITNESS-3 got into a verbal altercation near the intersection of Candelaria Road NE and Adams Street NE in Albuquerque. During the altercation, MARTINEZ fired two shots from a pistol toward WITNESS-3, but did not strike WITNESS-3 or his/her vehicle.

86.    **Incident 3:** On or about January 6, 2020, WITNESS-3 heard gunshots outside his residence. The next morning, WITNESS-3 discovered his vehicle had at least one gunshot hole in it. WITNESS-3 believed MARTINEZ was the person who had shot his vehicle, as MARTINEZ was the only person WITNESS-3 had a prior conflict with.

87.    I believe WITNESSES 1-3 are merely citizen informants, each of which reported a suspected violent crime to law enforcement out of concern for their safety and the safety of the community. I do not believe WITNESSES 1-3 to lawbreakers, deceivers, or motivated by nefarious intentions with regard to their reporting to law enforcement. I am aware all three witnesses are fearful of MARTINEZ and have expressed a reluctance to press charges against him out of a fear of retaliation.

88.    **Methamphetamine and Firearms within the Subject Premises and Vehicle:** CHS-1 and CHS-2 have visited with MARTINEZ at the Subject Premises on numerous occasions within the past three months and observed MARTINEZ to be in possession of at least one of the following items of contraband on each visit: a black pistol, multiple grams of methamphetamine, drug packaging supplies, and/or drug paraphernalia utilized in the consumption of methamphetamine.

89.    CHS-1 reported MARTINEZ was being sourced by California Sureño gang members and regularly received multi-ounce quantities of "pure" methamphetamine. CHS-1 knew one of the California

Sureño members from federal prison and knew him to have cartel connections in Tijuana, Mexico. CHS-1 also reported MARTINEZ had been smoking methamphetamine in recent weeks and was increasingly paranoid. CHS-1 related MARTINEZ believed the FBI was watching him and some of his family members had been trying to kill him.

90.     CHS-2 reported MARTINEZ regularly traveled from the Subject Premises to Albuquerque to sell methamphetamine. CHS-2 knew MARTINEZ to travel in the Subject Vehicle and keep his methamphetamine and pistol under the front hood of the Subject Vehicle. CHS-2 believed MARTINEZ did this to avoid law enforcement discovery of the drugs and firearm. MARTINEZ would retrieve the drugs and gun when he arrived at his destination. MARTINEZ told CHS-2 he kept additional firearms at his residence and had recently provided a firearm to another SNM member who had lost his during a fight in the parking lot of the Sandia Casino in Albuquerque.

## THE TARGET SUBJECT

91.     Based on my investigation of MARTINEZ, I am aware he became a validated member of the SNM while in federal prison. MARTINEZ is also a documented member of the Valley Gardens street gang in Albuquerque.

92.     MARTINEZ was previously a target of the overall SNM investigation in the fall of 2016. At that time, MARTINEZ was living in Albuquerque and suspected of conspiring with other SNM members to target FBI witnesses and informants in the government's case against the gang.[7] MARTINEZ also sold controlled substances to an FBI informant.

93.     In September 2016, I obtained 12 federal search warrants targeting 12 SNM members on the street in an effort to mitigate the threat directed at the government's witnesses and informants.

---

[7] **SYNDICATO PRISON GANG TARGETS WITNESSES, FBI AGENTS** (Albuquerque Journal) 12/18/16 - With an unprecedented federal prosecution pending against dozens of its members and associates, the notorious Syndicato de Nuevo Mexico prison gang has fought back in recent months by marking victims, witnesses, informants and even perceived informants for death, according to newly released court documents. Gang members have gone so far as to have discussed killing FBI agents and blowing up a federal building in response to the multi-agency investigation and prosecution of Syndicato members. (https://www.abqjournal.com/847504/prison-gang-targets-witnesses-fbi-agents.html)

MARTINEZ's former Albuquerque residence was one of the locations searched. Agents seized drugs from his house and an FBI Task Force Officer charged MARTINEZ with state drug violations. FBI agents seized 12 firearms, heroin and methamphetamine from the other locations.

94.     MARTINEZ has prior arrests for shooting at or from a motor vehicle, being a felon in possession of a firearm, aggravated battery, aggravated assault, forgery, burglary, assault, conspiracy to commit a crime, tampering with evidence, driving under the influence and supervised release violations.

95.     MARTINEZ has prior felony convictions in New Mexico for forgery and being a felon in possession of a firearm and ammunition.

96.     The Subject Vehicle is a silver 2009 Cadillac CTS, New Mexico license plate 946WLX, VIN: 1G6DF577290160834, and is registered to MARTINEZ.

97.     <u>Indicia of Residence:</u> I believe MARTINEZ lives at the Subject Premises for the following reasons:

      a.  MARTINEZ' current New Mexico driver's license lists the Subject Premises as his residence;

      b.  MARTINEZ currently receives social services and listed the Subject Premises as his residence;

      c.  New Mexico Court records from May 2018, list the Subject Premises as MARTINEZ' residence;

      d.  law enforcement and public database records list the Subject Premises as MARTINEZ' residence; and

      e.  CHS-1 and CHS-2 have visited MARTINEZ at the Subject Premises on several occasions in recent months and believe him to reside there.

### THE SUBJECT PREMISES

98.     The Subject Premises is located at 1066 Don Felipe Road, Belen, New Mexico and may be described as a single story mobile home with tan colored siding, white trim, and a red metal roof. There are red wooden steps leading up to the front door. The numbers 1066 are posted on the mailbox in

front of the Subject Premises. Color photographs of the location have been included in Attachment A. The search of the Subject Premises shall include the entire residence and all outbuildings, trash cans, storage containers, and vehicles parked at, or in front of, the Subject Premises.[8]

## SEARCHING FOR TATTOOS:

99.     When the search warrant is executed, agents will attempt to interview MARTINEZ about his affiliation with the SNM. It has been my experience suspected gang members lie when speaking with law enforcement and will sometimes go to great lengths to conceal their gang ties. Furthermore, MARTINEZ may exercise his constitutional right to refrain from speaking with me. Therefore I am requesting FBI agents be permitted to search MARTINEZ's body, above the waist and below the thighs, for tattoos in an effort to discern and document his gang affiliation.

100.     Law enforcement and corrections department records that I have reviewed in this case indicate MARTINEZ has several tattoos on his body. I believe MARTINEZ may have SNM and Valley Gardens gang related tattoos.

101.     I am aware most SNM members, but not all, have distinct tattoos that represent their dedication to the SNM. Some members display these tattoos to gain respect within the criminal enterprise and to intimidate non-members. I know some of the tattoos evidencing membership in or association with the SNM include, but are not limited to: the Zia symbol, the letters "SNM" or "S," the words "Syndicato de Nuevo Mexico," "Syndicato," "Burque," "Duke City," "New Mexico," the numbers "19," (S being the 19th letter of the alphabet) "505," the outline of the State of New Mexico, and other imagery that may signify New Mexico.

102.     **Exhibit 1**, which consists of 2-pages and has been attached hereto, contains several examples of SNM tattoos.

---

[8] Only vehicles parked at the Subject Premises or in front of the Subject Premises and having an apparent connection to the Subject Premises will be searched. Connection to the Subject Premises may be established by way of prior law enforcement observation, vehicle registration, subject admission or possession of an ignition key.

## CONCLUSION

103.    Based on the aforementioned information and investigation, I submit that probable cause exists to search the Subject Premises, Subject Vehicle, and Subject described in Attachment A, for the items described in Attachment B, which are evidence, fruits, and instrumentalities of, or property designated for use, intended for use, or used in committing violations of 18 U.S.C. §§ 1962, 1959, 924(c), 922(g)(1) and 21 U.S.C. § 841(a)(1). This affidavit has been reviewed by Supervisory Assistant United States Attorney Jack Burkhead of the District of New Mexico.

Respectfully submitted,

Bryan Acee
Special Agent
Federal Bureau of Investigation

SUBSCRIBED TO AND SWORN BEFORE ME ON JANUARY ___10th___, 2020:

HONORABLE KAREN B. MOLZEN
UNITED STATES MAGISTRATE JUDGE
DISTRCT OF NEW MEXICO

**EXHIBIT 1** - Example SNM Gang Tattoos



**EXHIBIT 1** - Example SNM Gang Tattoos

